Miguel Antonio **APARICIO**

v.

**SWAN LAKE et al.**

Albert Alejandro **PHILLIPS**

v.

**M/V MING SHINE et al.**

Gavaldo Nelson **DOWNS**

v.

**M/V MING SHINE et al.**

Kemmis **CLOVIS**

v.

**S/S TULLAHOMA et al.**

Nos. CV. 78–403–B, CV. 78–422–B, CV. 78–424–B and CV. 78–442–B.

District Court, Canal Zone, Balboa Division.

Nov. 20, 1979.

David J. Kiyonaga, Balboa, Canal Zone, for all plaintiffs.

Woodrow DeCastro, Balboa, Canal Zone, for all defendants.

Dwight A. McKabney, John L. Haines, Jr., James R. Dunworth, Balboa, Canal Zone, for third-party defendant.

SEAR, District Judge.

The operative facts in these four personal injury cases are identical. In each the plaintiff, a harbor worker employed by the Panama Canal Company, was injured while working aboard a vessel transitting the Panama Canal.[1] Alleging that his injuries were caused by the vessel's unseaworthiness and the crew's negligence, each injured worker brought suit against the vessel. The vessels in turn filed third-party complaints against the Panama Canal Company[2] for indemnity, asserting that it had

---

1. All the plaintiffs were employed as "line handlers". Each was assigned to a particular lock in the Panama Canal. As a ship approached the lock, they were transported to the vessel by boat. Once aboard their job was to fasten a cable to the vessel from the electric locomotives, or "mules", which towed the vessel through the lock. It is true that they performed some work traditionally performed by seamen, for they worked on board ship assisting the vessel in navigation by fastening and unfastening lines. See *Sandoval v. Mitsui Sempaku K.K. Tokyo,* 460 F.2d 1163, 1166 (5th Cir. 1972). However, the line handlers were not assigned to any particular ship or fleet of ships, and they spent only a short time aboard any

one vessel. Moreover, they were land-based employees who took their orders at all times from a Panama Canal Company pilot, not from any member of the vessel's crew. While the issue is not entirely free from doubt, I conclude that the plaintiffs were harbor workers, not seamen. See *Offshore Company v. Robison,* 266 F.2d 769 (5th Cir. 1959). Were they privately employed, they would be covered by the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901, et seq.

2. Since the time these suits were filed, the Panama Canal Act of 1979 was passed. Under that act, all references to the Panama Canal Company are deemed to be to the Panama

breached its warranty of workmanlike performance. See *Ryan Stevedoring Co. v. Pan Atlantic S.S. Co.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). In its answer to each third-party complaint the Panama Canal Company asserted as an affirmative defense that any recovery against it was precluded by the provisions of the Federal Employees' Compensation Act (FECA), 5 U.S.C. § 8101 et seq., since each plaintiff had received compensation payments from it under that act. The defendants have each responded with motions to strike the affirmative defense.

In *Sandoval v. Mitsui Sempaku K.K. Tokyo,* 460 F.2d 1163 (5th Cir. 1972), a case involving a pre-1972 accident, the Fifth Circuit held that both *Sieracki v. Seas Shipping Co.,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) and *Ryan, supra,* applied in FECA suits. Those cases held that a shipowner owed longshoremen and harbor workers the duty to provide a seaworthy vessel and that a shipowner sued by an injured longshoreman for breach of that duty or for negligence could sue the stevedore-employer for indemnity for breach of the warranty of workmanlike performance. Defendants argue that *Sandoval* is still controlling and that under *Ryan* and *Sandoval,* they may recover over from the Panama Canal Company. The Company responds that while nothing in the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901, et seq., specifically addresses the situation of employees covered by FECA, the clear Congressional intent behind those amendments mandates that the *Sieracki-Ryan* doctrine be abrogated in FECA as well as LHWCA cases.

The issue has arisen before in this district. In *Guevara v. Cia Sud Americana de Vapores,* 1978 A.M.C. 2000 (D.C.Z., 1978), Hon. James C. Hill, United States Circuit Judge sitting by designation, held that *Sandoval* controlled. Judge Hill acknowledged that the 1972 Amendments cast doubt upon the continuing vitality of *Sandoval,* but he felt himself bound, as a Circuit Judge sitting by designation, to hold that *Sandoval* was controlling until specifically overruled by the Fifth Circuit. Despite his open invitation to the parties to appeal the issue to the Fifth Circuit, they declined to do so, and the issue has yet to be decided by the Court of Appeals.

The legislative history of the 1972 Amendments to the LHWCA demonstrates deep-seated hostility in Congress toward *Sieracki* and *Ryan.* The House of Representatives Education and Labor Committee commented as follows upon the problems created by those two cases:

" . . . Under the *Sieracki* case, vessels are liable, as third parties, for injuries suffered by longshoremen as a result of 'unseaworthy' conditions even though the unseaworthiness was caused, created, or brought into play by the stevedore (or an employee of the stevedore) rather than the vessel or any member of its crew. For example, under present law, if a member of a longshore gang spills grease on the deck of a vessel and a longshoreman slips and falls on the grease a few moments later, the vessel is liable to pay damages for the resulting injuries, even though no member of the crew was responsible for creating the unseaworthy condition or was even aware of it. Furthermore, in the example given above, under the Supreme Court's decision in *Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp.,* 350 U.S. 124 [76 S.Ct. 232, 100 L.Ed. 133] (1956), the vessel may recover the damages for which it is liable to the injured longshoreman from the stevedore which employed the longshoreman on the theory that the stevedore has breached an express or implied warranty of workmanlike performance to the vessel. The end result is that, despite the provision in the Act which limits an employer's liability to the compensation and medical benefits provided in the Act, a stevedore-employer

Canal Commission for purposes of applying the Canal Zone Code and all other laws and regula-

tions of the United States. P.L. 96–70, § 3(b)(5).

is indirectly liable for damages to an injured longshoreman who utilizes the technique of suing the vessel under the unseaworthiness doctrine.

"The Committee heard testimony that the number of third-party actions brought under the *Sieracki* and *Ryan* line of decisions has increased substantially in recent years and that much of the financial resources which could better be utilized to pay improved compensation benefits were now being spent to defray litigation costs. Industry witnesses testified that despite the fact that since 1961 injury frequency rates have decreased in the industry, and maximum benefits payable under the Act have remained constant, the cost of compensation insurance for longshoremen has increased substantially because of the increased number of third party cases and legal expenses and higher recoveries in such cases. The Committee also heard testimony that in some cases workers were being encouraged not to file claims for compensation or to delay their return to work in the hope of increasing their possible recovery in a third party action. The Committee's attention was also called to the decision in 1966 of the United States district court in Philadelphia concerning the impact of third party claims involving injured longshoremen on the backlog of personal injury cases in that court."

1972 U.S.Code Cong. and Admin.News, pp. 4698, 4702–03.

Because of the incongruity of allowing indirect suits against the stevedore, Congress amended § 5(b) of the LHWCA, 33 U.S.C. § 905(b), to overrule *Sieracki* and *Ryan* insofar as those covered by the LHWCA were concerned. The House Report is again instructive.

"The Committee believes that especially with the vast improvement in compensation benefits which the bill would provide, there is no compelling reason to continue to require vessels to assume what amounts to absolute liability for injuries which occur to longshoremen or other workers covered under the Act who are injured while working on those vessels. In reaching this conclusion, the Committee has noted that the seaworthiness concept was developed by the courts to protect seamen from the extreme hazards incident to their employment which frequently requires long sea voyages and duties of obedience to orders not generally required of other workers. That rationale which justifies holding the vessel absolutely liable to seamen if the vessel is unseaworthy does not apply with equal force to longshoremen and other non-seamen working on board a vessel while it is in port.

"Accordingly, the Committee has concluded that, given the improvement in compensation benefits which this bill would provide, it would be fairer to all concerned and fully consistent with the objective of protecting the health and safety of employees who work on board vessels for the liability of vessels as third parties to be predicated on negligence, rather than the no-fault concept of seaworthiness. This would place vessels in the same position, insofar as third party liability is concerned, as land-based third parties in non-maritime pursuits. . .

"The Committee also believes that the doctrine of the *Ryan* case, which permits the vessel to recover the damages for which it is liable to an injured worker where it can show that the stevedore breaches an express or implied warranty of workmanlike performance is no longer appropriate if the vessel's liability is no longer to be absolute, as it essentially is under the seaworthiness doctrine. Since the vessel's liability is to be based on its own negligence, and the vessel will no longer be liable under the seaworthiness doctrine for injuries which are really the fault of the stevedore, there is no longer any necessity for permitting the vessel to recover the damages for which it is liable to the injured worker from the stevedore or other employer of the worker."

*Id.* at 4703–04.

■ Unfortunately, Congress overlooked the fact that some longshoremen and har-

bor workers, such as the plaintiffs in these four cases, are covered by FECA rather than LHWCA. One might therefore argue that *Sieracki* and *Ryan* remain effective in cases brought by federally employed longshoremen and harbor workers. However, this argument overlooks two vital factors. The first is the hostility evinced by Congress to the holdings of those two cases. Congress quite naturally focused its attention on those persons covered by the LHWCA, since most longshoremen and harbor workers are covered by that act, but this focus does not imply that Congress meant to keep *Sieracki* and *Ryan* in force in cases involving federally employed longshoremen or harbor workers. While it is true that Congress increased LHWCA benefits at the same time as it abrogated *Sieracki* and *Ryan,* there is little indication that the increase played any major role in that decision. Indeed, it would make little sense to ascribe to Congress an intent to distinguish in this regard between privately employed and federally employed longshoremen and harbor workers, for they do the same sort of work and are covered by similar compensation schemes. The second factor is the traditional role of the judiciary in the admiralty field of fashioning new rules to correspond to changing circumstances. *Quinn v. Central Gulf S.S. Corp.,* 1977 A.M.C. 204, 210 (D.Md.). For instance, the Supreme Court recently reversed a rule of 120 years standing in *United States v. Reliable Transfer Co.,* 421 U.S. 397, 409–10, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), wherein the Court, finding that intervening events warranted such a change, held that proportional fault rather than divided damages should be the rule in property damage cases.

In considering a set of facts virtually identical to those which I face here, the court in *Quinn,* after noting the two factors discussed just above, held that:

"[a]bandoning *Sieracki* would be consistent with the obvious intent of Congress to protect vessel owners from liability not caused by their own negligence  .  .  .
"To do other than abandon *Sieracki* in light of the changed circumstances

brought about by the 1972 amendments would amount to holding that the '*Sieracki* seaman' survives 'by sheer inertia rather than by reason of any intrinsic merit.' "

1977 A.M.C. at 210–11. I believe that holding to be correct. Moreover, since *Ryan* was simply an outgrowth of *Sieracki* designed to ameliorate some of its harshest effects upon the shipowners, it too must fall. *Sandoval* was decided before the 1972 Amendments became effective, and the Fifth Circuit thus had no reason to consider their effect in that case. I find that the 1972 Amendments to the LHWCA have rendered *Sieracki, Ryan* and *Sandoval* obsolete. They therefore have no continuing value as precedent. Accordingly,

IT IS ORDERED that the Motions to Strike in the four above-captioned cases are DENIED, and

IT IS FURTHER ORDERED that all allegations in plaintiffs' complaints to a breach of the warranty of seaworthiness are stricken. However, particularly in view of Judge Hill's decision in *Guevara,* I recognize that there is substantial ground for difference of opinion on this issue. Since this is a controlling issue of law and since an immediate appeal should ultimately advance the termination of this litigation and other similar cases, all of which must be concluded by April 30, 1982, leave will be granted to both plaintiffs and defendants to take an interlocutory appeal from this order to the Fifth Circuit Court of Appeals, provided application is made within ten days of the date of this order as provided by 28 U.S.C. § 1291(b).